## SMITH v. UNITED STATES.

### No. 60.

District Court, E. D. Louisiana.

Oct. 21, 1937.

W. J. & H. W. Waguespack, of New Orleans, La. (Herbert W. Waguespack, of New Orleans, La., of counsel), for libelant.

Lucien Y. Ray, Sp. Atty. in Admiralty, and William I. Connelly, Atty., U. S. Maritime Commission, both of New Orleans, La., for the United States.

BORAH, District Judge.

Libelant, a former member of the crew of the steamship Youngstown, brings this action seeking to recover damages for the injury which he sustained on September 2, 1926. As grounds for relief, libelant charges that on the morning of the day in question he, as boatswain, was ordered by the chief mate to take two able seamen working day work and go down in No. 3 hold and take down such sweat boards as were necessary to enable him to scrape the side of the ship and prepare it for painting. That in order to do this work he was required to climb up on the lower sweat boards to take off the top sweat boards, and while engaged in the performance of this work the nails holding the sweat board upon which he was standing either broke or pulled out, causing him to fall to the bottom of the hold, where he sustained injuries to the back of his head and neck.

Libelant contends that the accident was entirely attributable to the negligence of the respondent and its agents in failing to provide a safe place or safe and reasonable ways, equipment, means, or devices with which libelant could perform the work, and in failing to make, observe, and enforce rules and regulations for the safe performance of the work which libelant and other employees of the respondent on board said vessel were engaged in performing. In specification of the charge that respondent failed to furnish libelant with a safe place in which to work, the libel charges that the nails or hooks holding said sweat boards were old, weakened, and insufficient to bear libelant's weight thereon, and either broke or pulled out, and that the respondent, in view of the insufficiency of the hooks holding the lower sweat boards in place, was negligent in that it failed to require the use of proper staging or ladders so that the top sweat boards could be safely reached, and thereby caused and required said work to be done improperly and without proper and adequate equipment.

In response to the interrogatories which were propounded to libelant, he stated that the work which he was doing at the time he fell was ordinary routine work which did not require special equipment or apparatus; that he saw the cargo batten or sweat board upon which he was standing before he fell, and in his opinion it must have been in bad condition, since it gave way. Upon being asked if he knew the condition of the nails, bolts, or screws which secured it in place, he replied that they must have been in bad condition because they pulled out, though he concedes that he made no subsequent examination to determine their condition. Again, when asked what caused the cargo batten to fall, he replied that the fastenings must have given way.

In his out of court testimony which was taken a day previous to the date of filing his answers to the interrogatories, libelant stated that the mate told him to take two men and go down in the No. 3 hold and take down the sweat boards necessary to enable him to scrape the side of the

ship and prepare it for painting. That as boatswain he was in charge of the job and was given no definite orders; that the selection of the equipment to be used in the way of going about this job was left entirely to him, and he, in turn, told the men where to work and what to do. When interrogated with reference to his falling, he stated that he could not remember whether a bolt or nail pulled out or broke, and that he was not sure whether he ever knew that the one that pulled off was nailed or bolted. Upon being questioned as to whether there was more danger working without a stage than with a stage, he replied that on this particular job a stage was not much good; that if you had a stage you would have to climb up and down the battens, lowering and raising your stage all of the time anyway. Later in his testimony he reluctantly ventured the supposition that had he used a staging it would have been safer, though it was customary and usual to climb up on the lower sweat boards. He stated further that the mate did not tell him to use a staging, but as boatswain he knew what equipment was needed for doing the work which he was going to undertake, so that it did not make any difference what the mate might have told him; that he just went right ahead and did what he knew should be done, and took what equipment he thought should be taken. Libelant frankly admits that there is always the danger that a sweat board may have been damaged by the working of cargo or by a sling striking it, and that it is not safe to hold on to; that as a usual thing he tests its strength by giving it a shake, and his supposition is that he did so on this occasion. He was unable, however, to give a cause for the board being loose, and could not say whether it was loosened because somebody left it loose or because something knocked it loose some time after it had been put up, though he concedes that either one of those things might have happened.

The chief officer testified that he went into No. 3 hold immediately after the accident and found Smith lying on the floor in the hold. That he saw the cargo batten lying on the floor under the place where Smith was supposed to be working, and it seemed to be all right and the bolt was out; that he saw no marks evidencing the fact that the batten had pulled loose or the bolt had broken; and at the time of his examination he found no broken or rotten battens in No. 3 hold.

The carpenter testified that all the boards that were nailed were stripped off; that only the bolted boards remained, and that his examination of all of the bolts revealed that they were in good condition and none of the cargo battens on the port side of the ship needed attention.

From the testimony it appears that the cargo battens in the No. 3 hold were constructed in sections, about eight in a group, running perpendicularly, and they were held in place by bolts to the side of the ship. Each batten had a bolt running through the batten and into a hole on the steel stringer, made fast with a nut from the inside.

Sargeant, a seaman, was apparently the only one who witnessed the accident. He testified that libelant was working in the forward part of the hold, and he observed him as he started up the battens with a monkey wrench in his hand; that he climbed from one stringer to another until he got to the top of the upper section and over to where he was going to work, and a few minutes after starting to work he fell. Sargeant says he next observed libelant at the moment he hit the bottom of the hold, at which time he had a batten in his arms. That the batten as it lay there beside libelant was free of the other part of the section, and had no bolts in it at all. Sargeant further stated it was customary for the battens to be removed in sections without the use of a staging, though same was available, and that the section in the upper forward part of No. 3 hold was being removed when Smith fell. The only explanation he could give as to how the individual batten could fall, if the battens were being removed in sections, is that it was loose by reason of the fact that the bolt could have been removed.

This action is brought under the Jones Act, section 33 (46 U.S.C.A. § 688), which by its adoption for the maritime law of the provisions of the Federal Employers' Liability Act (45 U.S.C.A. § 51 et seq.) specifically imposes liability for negligence of officers and fellow employees and for defects in appliances or other equipment due to negligence. The act also gives to seamen a right to recover for personal injuries due to the negligent failure of the officers of the vessel to provide a safe place in which to work. Under recent decisions of the Supreme Court, it is now settled that assumption of risk is not a defense to a suit brought by a seaman under the Jones Act for negligent failure of

the master to provide safe appliances or a safe place in which to work. The Arizona et al. v. Anelich, 298 U.S. 110, 56 S.Ct. 707, 80 L.Ed. 1075; Beadle v. Spencer, 298 U. S. 124, 56 S.Ct. 712, 80 L.Ed. 1082.

Applying the law to the facts as recited, it is apparent that libelant cannot prevail in this action. Indeed, his own testimony establishes the fact that the work which he was doing did not require the use of staging or other special equipment. Furthermore, he was given no definite orders by the mate as to how this work should be done, and the selection of the equipment and place to work was left entirely to him. Had he desired to use staging, same was available; but as an experienced seaman he knew what equipment was needed so he went ahead about his task and selected his own equipment. The testimony also fails to support the charge that the nails or hooks holding the sweat boards were old, weakened, and insufficient to bear libelant's weight thereon, and, even if it did, no showing has been made that this defect or insufficiency was in any manner due to respondent's negligence. In short, this record wholly fails to support the charge that libelant was injured by a breach of duty owed by respondent to him, and that his injuries resulted approximately therefrom. On the contrary, the conclusion is warranted that the ship was seaworthy in equipment when she broke ground, and that the injuries which libelant received were not in any manner attributable to the negligent failure of the respondent to provide safe appliances or a safe place in which to work.

A decree may accordingly be entered for the respondent, dismissing the libel, with costs.